Filed 9/18/15  P. v. Kegel CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G050008 |
| v. | (Super. Ct. No. 12HF1936) |
| ROBERT JOHN KEGEL, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Lance Jensen, Judge.  Affirmed.

Richard Power, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Randell D. Einhorn and Peter Quon, Jr., Deputy Attorneys General, for Plaintiff and Respondent.

Robert John Kegel was convicted in a jury trial of driving while under the influence of alcohol and driving with a blood-alcohol level of 0.08 percent or higher with three or more priors (Veh. Code, §§ 23152, subds. (a) & (b), 23550, all further statutory references are to the Veh. Code), and driving on a suspended license (§ 14601.2, subd. (a)). On appeal, Kegel raises two instructional errors: (1) the trial court erred by instructing the jury in accordance with CALCRIM No. 2111, concerning permissive inferences that could be drawn from the results of testing done within three hours of a defendant's driving; and (2) the trial court erred by refusing to instruct with the language of section 23610, subdivision (a)(2), that if a defendant's blood alcohol level was 0.05 percent or more but less than 0.08 percent no presumption arises affecting the burden of proof of driving under the influence. We reject his contentions and affirm the judgment.

FACTS & PROCEDURE

*Prosecution Evidence*

In January 2012, California Highway Patrol Officer Carina Baldridge and her partner, Officer Joshua Nelson, were on patrol on the Interstate 5 freeway at about 2:38 a.m., when they saw Kegel's car weaving in and out of its lane. The officers activated the patrol car's flashing lights to stop Kegel. Kegel did not immediately respond. Five seconds would be a normal response time at night. Kegel continued to weave down the freeway for about 30 seconds, missing the first exit, before finally slowing down and exiting the freeway in accordance with Baldridge's verbal directions given over the patrol car's public address system.

Baldridge approached Kegel's car and spoke to him. She noticed Kegel's eyes were red and watery, and he emitted a strong odor of alcohol. Nelson similarly noticed a strong alcohol odor coming from Kegel. Kegel was able to produce his California identification card and car registration without difficulty, and got out of his car at the officers' request. In response to Baldridge's questions, Kegel said he drank one

2

whiskey and Coke at a bar, beginning about one hour earlier and finishing the drink about 30 minutes earlier. He had last eaten at 5:00 p.m. Based on the bar's location, Baldridge estimated Kegel would have been driving on the freeway for 10 to 15 minutes before he was stopped. Kegel told the officers his car had no mechanical problems, and he had no medical or physical limitations.

Baldridge administered various field sobriety tests to Kegel. He performed poorly on the horizontal gaze nystagmus test, the walk-and-turn test, and the Romberg balance test. His performance of the one-leg-stand test was acceptable. Baldridge's overall opinion from the field sobriety tests, her physical observations of Kegel, and his admission he had consumed alcohol prior to driving, was that Kegel displayed objective signs of being under the influence. Nelson similarly believed Kegel was under the influence.

Baldridge next conducted a preliminary alcohol screening (PAS) test by having Kegel blow into a hand-held PAS device to measure the blood-alcohol level of his exhaled breath.[1] The first PAS test was done at 2:56 a.m., and showed a blood-alcohol level of 0.058 percent. Although the PAS device was functioning properly and showed no error codes, Baldridge did not believe the first PAS result was accurate given Kegel's objective signs of intoxication. She thought Kegel did not take a deep enough breath the first time. She had Kegel blow into the PAS device a second time at 2:59 a.m., which showed a 0.107 percent blood-alcohol level, and a third time at 3:02 a.m., which showed a 0.111 percent blood-alcohol level.

---

[1] Authorized by section 23612, subdivision (h), "A preliminary alcohol screening test (PAS) is an investigative tool used to determine whether there is reasonable cause for arrest[.] As explained in 72 Ops.Cal.Atty.Gen. 226, 227 (1989), a preliminary test is 'distinguished from the chemical testing of a driver's blood, breath or urine contemplated by the implied consent law ( . . . § [23612]) which is administered after the driver is arrested, [and is] sometimes referred to as 'evidentiary' [or evidential] testing.' (Underscoring omitted.)" (*People v. Vangelder* (2013) 58 Cal.4th 1, 5, fn. 1.)

At that point, Baldridge believed Kegel's erratic driving prior to being stopped, his physical appearance, his poor performance on field sobriety tests, and his last two high blood-alcohol percentages reported by the PAS device, were consistent with being under the influence of alcohol at the time he operated his vehicle. She arrested him for being under the influence of alcohol while driving.

After he was arrested, Baldridge performed the "implied consent" chemical testing authorized by section 23612. Kegel opted for a breath test, which Baldridge conducted using a portable evidentiary breath test (PEBT) machine. The first PEBT test was performed at 3:12 a.m. and showed Kegel had a blood-alcohol level of 0.12 percent. A second PEBT test was performed at 3:15 a.m. and showed Kegel's blood-alcohol level to be 0.11 percent.

As Kegel was being transported to jail, he spontaneously said he did not condone drunk driving, "he just got caught slipping up this time." Baldridge and Nelson testified Kegel's demeanor remained consistent throughout the entire encounter, which lasted about one and one-half hours from initial contact through booking, i.e., it did not change in such a way as to suggest he was becoming more intoxicated or sobering up.

California Highway Patrol Officer Stephen Miles testified as to how the PAS device and PEBT machine are maintained and calibrated. Both devices used during Kegel's arrest were working properly.

Erin Nixt, a forensic scientist at the Orange County Crime Laboratory, testified as the prosecution's expert. She explained the operation of the PAS device and the PEBT machine and how they are used to obtain accurate blood-alcohol level measurements. The PAS device is just for preliminary screening. The PEBT machine, an Alco-Sensor IVXL, is used for the "evidential" testing. Duplicate tests are obtained to validate the test results. When using the PEBT machine, test results within .02 percent of each other are considered duplicate.

Nixt stated the first PEBT test done at 3:12 a.m, showed Kegel had a

4

blood-alcohol level of .124 percent, and the second performed at 3:15 a.m. showed a blood-alcohol level of .114 percent. She explained the greater volume of breath provided for the test, the more accurate the measurement of blood-alcohol level because air in the deepest part of the lung is most representative of the blood-alcohol level. As to the PEBT tests, the first test (0.124 percent) was based on a higher volume of breath than the second, so Nixt believed it was more representative of Kegel's actual blood-alcohol level.

As for the preliminary screening done with the PAS device, Nixt explained increasing blood-alcohol levels in PAS results does not necessarily mean a rising blood-alcohol level—it could just be indicative of differences in the volume of air in each of the samples. Nixt testified about various field sobriety tests, including those administered to Kegel, explaining how his performance on several was indicative of being under the influence of alcohol. Like Baldridge, she too would have expected Kegel's first blood-alcohol level as tested with the PAS device to have been higher than 0.058 percent. She opined the difference between the first PAS test (0.058 percent) and the second (.107 percent) just three minutes later was likely due to an insufficient volume of exhaled air on the first PAS test.

Nixt testified as to how alcohol affects a person. Most people are impaired for driving when they have a blood-alcohol level of 0.05 percent or higher. When asked a hypothetical based on Kegel's height (five-foot, eight inches) and weight (150 pounds), based the test results, Kegel would have consumed four and one-half to five and one-half drinks.

*Defense Evidence*

Defense forensic alcohol expert witness Darrell Clardy testified the PAS device and PEBT machines are both reliable and analytically the same. He believed that during the absorption phase, a breath test overstates the blood-alcohol level. Given a hypothetical mirroring the facts of this case in which a person stopped consuming alcoholic beverages at 1:30 a.m., drove until 2:38 a.m., and had the following

5

blood-alcohol levels at the following times:  2:56 a.m.—0.058 percent; 2:59 a.m.— 0.107 percent; 3:02 a.m.—0.111 percent; 3:12 a.m.— 0.12 percent; and 3:15 a.m.—0.11 percent, Clardy opined the person was in a classic absorption phase with a rising blood-alcohol level that plateaued at 3:15 a.m.  He opined the person was not driving while under the influence of alcohol between 2:38 a.m. and 2:41 a.m.  A person of Kegel's size, with his blood-alcohol level of 0.124 percent at 3:12 a.m. and 0.114 percent at 3:15 a.m., would have consumed between four and six standard alcoholic beverages by 2:08 a.m. and at 2:38 a.m., and would not be under the influence of alcohol if driving.

Clardy agreed he had not performed any tests on Kegel to assess his alcohol absorption rate.  Clardy testified field sobriety tests are screening measures and are not definitive in determining if a person is driving under the influence.  On cross-examination, he agreed a person's poor performance of field sobriety tests is a good indicator the person consumed alcohol.

*Charges, Verdict, and Sentence*

Kegel was charged with driving under the influence with three or more priors (§§ 23152, subd. (a), 23550) (count 1); driving with a blood alcohol of 0.08 percent or more with three or more priors (§§ 23152, subd. (b), 23550) (count 2); and misdemeanor driving on a suspended license (§ 14601.2, subd. (a)) (count 3).  The information alleged Kegel had two prior convictions for driving under the influence in 2010 and 2012 (§ 23152, subd. (a)), and a prior conviction for reckless driving in 2008 (§ 23103).  Kegel pleaded guilty to count 3 and the remaining counts were tried to a jury. The jury found Kegel guilty on counts 1 and 2, and in a bifurcated trial the court found all the allegations of prior convictions to be true.  The court placed Kegel on five years formal probation and sentenced him to one year in jail on count 1 as a condition of probation and a consecutive one year in jail on count 3.  The court stayed sentence on count 2 pursuant to Penal Code section 654.

6

*1. CALCRIM No. 2111*

Kegel contends his conviction on count 2, driving with a blood-alcohol level of 0.08 percent or more in violation of section 23152, subdivision (b), must be reversed because the trial court improperly instructed the jury with CALCRIM No. 2111, which he claims violated his due process rights by reducing the prosecution's burden of proof. We find no error.

The trial court gave CALCRIM No. 2111, which in relevant part instructed the jury as follows: "If the People have proved beyond a reasonable doubt that a sample of the defendant's (breath) was taken within three hours of the defendant's alleged driving and that a chemical analysis of the sample showed a blood alcohol level of 0.08 percent or more, you may, *but are not required to*, conclude that the defendant's blood alcohol level was 0.08 percent or more at the time of the alleged offense." (Italics added.) The relevant language from CALCRIM No. 2111 is based on section 23152, subdivision (b), which provides in part, "In any prosecution under this subdivision, it is a rebuttable presumption that the person had 0.08 percent or more, by weight, of alcohol in his or her blood at the time of driving the vehicle if the person had 0.08 percent or more, by weight, of alcohol in his or her blood at the time of the performance of a chemical test within three hours after the driving." Kegel argues the permissive inference portion of CALCRIM No. 2111 impermissibly reduced the prosecution's burden of proof.

The Attorney General contends Kegel's claim of instructional error is waived because he failed to object to the instruction below. "Generally, failure to object does not waive an instructional error on appeal if the instruction was an incorrect statement of law or the defendant's substantial rights were affected. [Citations.] The invited error doctrine likewise poses no obstacle to raising a claim of instructional error on appeal, unless there was a conscious, deliberate or tactical reason stated for the appellant's acquiescence in the instruction at trial. [Citations.]" (*People v. Vega* (2015)

7

236 Cal.App.4th 484, 495 (*Vega*).)  We will address the merits of Kegel's attack on CALCRIM No. 2111 because he claims giving the instruction implicated his substantial rights and in order to forestall a future claim of ineffective assistance of counsel.  (*Vega, supra,* 236 Cal.App.4th at p. 495.)

CALCRIM No. 2111 did not impermissibly reduce the prosecution's burden of proof.  Although section 23152, subdivision (b), describes a rebuttable presumption, the California Supreme Court has held a jury instruction phrased as a rebuttable presumption in a criminal case creates an unconstitutional mandatory presumption.  (*People v. Roder* (1983) 33 Cal.3d 491, 497-505 (*Roder*).)  Accordingly, CALCRIM No. 2111 is written as a permissive inference.   (See CALCRIM No. 2111, Bench Notes.)  "As the United States Supreme Court has explained, 'The most common evidentiary device is the entirely permissive inference or presumption, which allows—but does not require—the trier of fact to infer the elemental fact from proof by the prosecutor of the basic one . . . .'  [Citation.]"  (*People v. Beltran* (2007) 157 Cal.App.4th 235, 240, fn. 4 (*Beltran*).)  "'"'Permissive presumptions' are not really presumptions at all.  Instead, they are simply inferences drawn from evidence.  They do not shift the prosecution's burden of production, and the jury is not required to abide by them.  An instruction about a 'permissive presumption' is really an instructed inference."'  [Citation.]"  (*Beltran*, *supra*, 157 Cal.App.4th at p. 242)  Because a permissive presumption "'leaves the trier of fact free to credit or reject the inference and does not shift the burden of proof, it affects the application of the "beyond a reasonable doubt" standard only if, under the facts of the case, there is no rational way the trier could make the connection permitted by the inference.'  [Citation.]"  (*People v. Roder* (1983) 33 Cal.3d 491, 498.)

Relying on *Beltran*, *supra*, 157 Cal.App.4th 235, Kegel nevertheless contends that in this case the permissive inference instruction "was not rationally connected to an element of the offense."  He asserts that because his blood-alcohol level

8

was *rising* after he was stopped, the jury could not rationally infer it was 0.08 percent or higher when he was stopped.  The circumstances of *Beltran* are clearly and materially distinguishable from those we have here and that case does not stand for the proposition that the permissible inference can never be applied in a rising blood-alcohol level situation.

In *Beltran*, the PAS test revealed a blood-alcohol level of *exactly* 0.08 percent 45 minutes after defendant was stopped, and a second test 30 minutes later showed his blood-alcohol level had risen to 0.10 percent.  (*Beltran*, *supra*, 157 Cal.App.4th at pp. 238-239.)  At trial, "both parties presented expert testimony which suggested that [defendant's blood-alcohol level] was below the legal limit at the time he was driving[,]" including that the prosecution expert estimated defendant's blood-alcohol level was between 0.068 and 0.095 percent when he was stopped and the defense expert estimated it was 0.06 percent when stopped (and pointed out the high number given by the prosecution witness of 0.095 made no sense given that defendant tested at a lower 0.08 much later and his blood-alcohol level was thereafter still rising).  (*Id.* at p. 239.)  In those particular circumstances, the appellate court concluded that allowing the jury to rely solely on the permissive inference to establish a fact inconsistent with the evidence adduced at trial was improper because "'"the suggested conclusion is not one that reason and common sense justify in light of the proven facts before the jury." [Citations.]'"  (*Id.* at p. 245.)  The court noted that blind adherence to a permissive inference in such cases "undermines the jury's responsibility to find the ultimate facts beyond a reasonable doubt."  (*Id.* at p. 244.)

*Beltran* was careful, however, to make clear that reliance on such permissive inferences is not a problem in a case where the proven facts are not inconsistent with the inference:  "[W]hen used in appropriate cases, permissive inferences do not shift the burden of production or lower the prosecution's burden of proof.

9

Because they may or may not be drawn by the jury, they do not operate in an unconstitutionally pernicious manner." (*Beltran*, *supra*, 157 Cal.App.4th at p. 244.)

In this case, by contrast to *Beltran*, the evidence of Kegel's post-stop blood-alcohol level is not inconsistent with allowing the jury to apply the permissive inference that his blood-alcohol level was 0.08 percent or higher when he was driving. In *Beltran*, defendant's blood-alcohol level was *exactly* 0.08 percent 45 minutes after he was driving and his blood-alcohol level was still rising, and both experts testified defendant's blood-alcohol level was *below* 0.08 percent when he was stopped. Thus, applying the permissive inference to allow the jury to find defendant's blood-alcohol level was 0.08 or higher when he was stopped was completely inconsistent with all the evidence that it was not.

Here, although Kegel's first PAS test, conducted 16 minutes after he was stopped, returned a result of a 0.058 percent blood-alcohol level, Baldridge testified, and the prosecution expert agreed, the first test result was likely inaccurate due to Kegel not breathing deeply enough before making that first attempt. Just *three minutes* later, the second PAS test showed a blood-alcohol level of almost double the first—0.107 percent, a result that was consistent with the next PAS test taken just another *three minutes* later of 0.111 percent. Thus, even if Kegel's blood-alcohol level was rising from the time he was stopped, the jury could still rationally conclude the first preliminary screening result was not representative of Kegel's real blood-alcohol level when he drove. Therefore, the first result does not so undercut the permissive inference in this case so as to preclude its use: "[a permissive inference] may be given regardless of whether there is other evidence admitted at trial 'rebutting' the inference." (*Beltran*, *supra*, 157 Cal.App.4th at p. 244.) Accordingly, Kegel's due process rights were not violated by giving CALCRIM No. 2111.

Kegel also argues the prosecutor misused the instruction, and the permissive inference it embodies, in closing argument by erroneously referring to it as a

10

"presumption" and by "inter-mix[ing]" the permissive inferences as applied to count 1 (straight driving under the influence), and count 2 (driving with a blood-alcohol level of 0.08 percent or more). We reject these contentions as well. [2]

There are two ways in which permissive inferences may be drawn from a 0.08 percent blood-alcohol level applicable in this case—the jury was instructed on both. As to count 1, driving under the influence in violation of section 23152, subdivision (a), the jury was given CALCRIM No. 2110. It tells the jury the elements of the generic offense: the defendant drove, and when he drove he was under the influence of alcohol. The instruction then tells jurors that for purposes of determining if the defendant was under the influence, "If the People have proved beyond a reasonable doubt that the defendant's [blood-alcohol level] was 0.08 percent or more at the time of the chemical analysis, you may, *but are not required to*, conclude that the defendant was under the influence of an alcoholic beverage at the time of the alleged offense." CALCRIM No. 2110 embodies the presumption contained in section 23610, subdivision (a)(3) ["[i]f there was at [the time of the test] 0.08 percent or more, by weight, of alcohol in the person's blood, it shall be presumed that the person was under the influence of an alcoholic beverage at the time of the alleged offense"], phrased as a permissive inference. As to count 2, the per se offense, the jury was instructed with CALCRIM No. 2111, as already discussed, and told if the defendant's blood-alcohol level was 0.08 percent or more within three hours after driving, the jury *may but is not required to* infer it was 0.08 percent at the time or driving. (§ 23152, subd. (b).)

Here, in closing argument the prosecutor argued as to count 1, the generic offense, the prosecution had to prove Kegel was under the influence of alcohol when he

---

[2]       As *Vangelder*, *supra,* 58 Cal.4th at page 6 explains, section 23152, subdivision (a) (driving under the influence) describes the generic offense, and section 23152, subdivision (b) (driving with a blood-alcohol level of 0.08 percent or more) is sometimes referred to as the "'per se offense.'"

11

drove. He then argued that as to count 2, the per se offense, the prosecution had to prove Kegel's blood-alcohol level was 0.08 or higher when he drove. The prosecutor then argued that if the prosecution proved Kegel's blood-alcohol level was 0.08 or higher "at the time of chemical analysis" the jury "may, but you are not required to, conclude [he] was under the influence" of alcohol when he drove. The prosecutor referred to this as "a presumption. You're allowed to presume that. You don't have to presume it, but you're allowed to presume it." The prosecutor then argued that with "that presumption" combined with the other facts, it had proven Kegel had a blood-alcohol level or 0.08 or higher when he was driving. Kegel raised no objections during the prosecutor's argument and made no request for any admonishment.

We reject Kegel's suggestion the prosecutor misled the jury by referring to the permissive inference as a presumption. The prosecutor may have used the word "presumption" but he clearly described it as a permissive inference. And Kegel "forfeited any claim of misconduct based on that remark by failing to object below or to seek a jury admonition. [Citation.]" (*People v. Montes* (2014) 58 Cal.4th 809, 885.) We must also reject Kegel's complaint the prosecutor misdescribed or confused the legal principles as to how the 0.08 percent or higher test result related to each of the separate counts. The jury was instructed it must follow the law as explained by the court, not the attorney's comments on the law (CALCRIM No. 200), and we must presume it followed the court's instructions. (*People v. Sanchez* (2001) 26 Cal.4th 834, 852 [absent evidence to contrary, reviewing court must presume jury understood and followed trial court's instructions].) The instructions clearly explained to the jury the application of the permissive inferences that could be drawn from a blood-alcohol level of 0.08 percent or higher.

12

*B. Failure to Give Requested Defense Instruction on Section 23610*

Kegel contends his conviction on count 1, driving under the influence, must be reversed because the trial court erred by refusing his special instruction on section 23610. We reject his contentions.

We begin with section 23610 which, as already mentioned above, describes presumptions affecting the burden of proof that arise in a driving under the influence prosecution based on a defendant's blood-alcohol level "at the time of the test as shown by chemical analysis of that person's blood, breath, or urine . . . ." (§ 23610, subd. (a).) Section 23610, subdivision (a)(1), provides that if the blood-alcohol level is less than 0.05 percent "it shall be presumed that the person *was not* under the influence of an alcoholic beverage at the time of the alleged offense." (Italics added.) Section 23610, subdivision (a)(3), provides that if the blood-alcohol level is 0.08 percent or more "it shall be presumed that the person *was* under the influence of an alcoholic beverage at the time of the alleged offense." (Italics added.) And section 23610, subdivision (a)(2), provides that if the blood-alcohol level at the time of the test is 0.05 percent or more but less than 0.08 percent, then *no presumption arises*—the defendant's blood-alcohol level is just one of the facts to be considered in determining whether he or she was under the influence of an alcoholic beverage at the time of driving.

When discussing jury instructions, the court stated it intended to give CALCRIM No. 2110 on count 1, driving under the influence. Defense counsel commented the instruction should be modified to describe all the presumptions set forth in section 23610. The court replied the pattern instruction already contained the bracketed language (included in the instruction as given by the court) that "If the People have proved beyond a reasonable doubt that the defendant's blood[-]alcohol level was 0.08 percent or more at the time of the chemical analysis, you may, but are not required to, conclude that the defendant was under the influence of an alcoholic beverage at the time of the alleged offense." It observed the instruction was written as a permissive

13

inference to comport with constitutional requirements,[3] and the instruction warned the bracketed language should not be included if there was no substantial evidence the defendant's blood-alcohol level was 0.08 percent or more. As there was substantial evidence that supported including the bracketed language about the permissive inference, the court asked defense counsel what was gained by including section 23610 in its entirety in the jury instructions. Defense counsel replied, "[i]t's the 05 to the 07 that causes me problems" and stated he believed the jury should be told how the presumptions worked if Kegel's blood-alcohol level was less than 0.05, or if the blood-alcohol level was between 0.05 and 0.08. The trial court invited defense counsel to offer a proposed addition or modification to CALCRIM No. 2110. Defense counsel responded by providing the court with a print out of section 23160 in its entirety (with a few minor deletions), which he suggested should be added to the pattern instruction, CALCRIM No. 2110. The court declined the proposed addition.

Kegel contends the trial court erred by refusing to instruct the jury with the entire language of section 23610. His particular focus is on section 23610, subdivision (a)(2), which he contends was needed to advise the jury there was no presumption (or permissive inference) of driving under the influence of alcohol if his blood-alcohol level was 0.05 percent or more but less than 0.08.

We fail to see what the proposed instruction would have added. There was no evidence Kegel's blood-alcohol level was less than 0.05 percent. And even if the first PAS result of 0.058 was evidence Kegel's blood alcohol level was between 0.05 percent and below 0.08 percent, the instruction as given told the jury the permissive inference of being under the influence of alcohol arose *only* if Kegel's blood-alcohol level at the time

---

[3] As already mentioned, because a jury instruction phrased as a rebuttable presumption in a criminal case creates an unconstitutional mandatory presumption (*Roder, supra,* 33 Cal.3d at pp. 497-505), the jury instructions CALCRIM Nos. 2110 and 2111 are written as permissive inferences rather than as presumptions.

14

of the chemical testing was 0.08 percent or more. Implicit in that charge is that no permissive inference of being under the influence could be drawn if the chemical tests showed Kegel's blood-alcohol level was less than 0.08. Moreover, giving the instruction as Kegel suggested (i.e., reading section 26310 in its entirety) could have confused the jury because the statute is written in terms of rebuttable presumptions as opposed to permissible inferences.[4]

In any event, failure to give the instruction Kegel sought was harmless under either *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*) [reverse unless error is harmless beyond a reasonable doubt], or *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*) [no reversal unless reasonably probable defendant would have obtained a more favorable result absent error].) The issue posed by the proffered instruction (whether Kegel's blood-alcohol level was between 0.05 and 0.08 percent) was resolved against Kegel in another context, pursuant to other, properly given instructions. (See, e.g., *People v. Sakarias* (2000) 22 Cal.4th 596, 625; *People v. Hayes* (1990) 52 Cal.3d 577, 628; *People v. Sanders* (1990) 51 Cal.3d 471, 509-510.) The jury convicted Kegel on count 2 of driving with a blood-alcohol level of 0.08 percent or higher, necessarily finding he had a blood-alcohol level of 0.08 or higher, which allowed the jury to permissibly infer he was driving under the influence for the purposes of count 1. And this is not, as Kegel would have us believe, a close case. The issue on count 1 was whether Kegel was under the influence of alcohol when he was driving. Kegel was observed weaving down the freeway late at night and delayed in responding to the officer's flashing lights. When he finally pulled over, he appeared to both officers to be intoxicated. His eyes were red and watery, and he reeked of alcohol. He admitted he had

---

[4] Kegel renews the argument made in connection with count 2, that the prosecutor misled the jury in his argument by "inter-mixing" application of the permissive inferences as between the two counts. We reject the argument for the reasons already stated above.

15

consumed alcohol. He failed field sobriety tests. Although the first PAS test, performed 16 minutes after he was stopped, showed a blood-alcohol level of 0.058 percent, Baldridge and the prosecution expert believed the result was inconsistent with Kegel's objective signs of intoxication and the result of his not breathing deeply before blowing into the device. The next two PAS readings performed just three minutes after the first, showed a blood-alcohol level of 0.107 percent and then 0.111 percent. The PEBT tests performed just 10 minutes after the PAS tests showed blood-alcohol levels of 0.12 percent and 0.11 percent. While being transported to jail for booking, Kegel spontaneously said he did not agree with drunk driving, "he just got caught slipping up this time." The abundant evidence that Kegel was under the influence of alcohol when he drove demonstrates any error in not giving the jury instructions was harmless under both *Chapman* and *Watson*.

## DISPOSITION

The judgment is affirmed.


O'LEARY, P. J.

WE CONCUR:


BEDSWORTH, J.


THOMPSON, J.

16