Filed 5/26/16  Bakir v. Shiomoto CA6

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| ONUR BAKIR,<br><br>  Plaintiff and Respondent,<br><br>  v.<br><br>JEAN SHIOMOTO, as Chief Deputy Director, etc.,<br><br>  Defendant and Appellant. | H040714<br>(Santa Clara County<br>Super. Ct. No. 1-13-CV250330) |

After Onur Bakir (driver) was stopped for speeding at 2:17 a.m., his blood alcohol was measured at 0.087 percent at 2:33 a.m. and 0.088 percent at 2:35 a.m. by a preliminary alcohol screening (screening) test and at 0.08 percent at 3:28 and 3:30 a.m. by a breath machine.  Driver stipulated to the accuracy of the screening results during an administrative license revocation proceeding.  A Department of Motor Vehicles (DMV) hearing officer concluded in light of this evidence and expert testimony that the concentration of alcohol in driver's blood when he was driving "was at or above 0.08%." However, the trial court granted driver's mandate petition and ordered the DMV to set aside its order suspending driver's driving privilege after independently weighing the evidence and accepting what it called the "unequivocal" opinion of an expert that driver's blood alcohol "was less than .08% at the time of driving."  The director of the DMV has filed an appeal, essentially questioning the sufficiency of the evidence to support the trial

court's ruling. Being unable to substitute our evaluation of the evidence for the trial court's, we will affirm the order.

## I. *EVIDENCE AT ADMINISTRATIVE HEARING*

Because the trial court focused on the meaning of the blood alcohol tests, it is unnecessary to review the other evidence in detail.

An officer stopped driver about 2:17 a.m. after observing him driving down the highway in a Volkswagen at speeds reaching 92 m.p.h. When stopped, driver, who was 205 pounds and an inch over six feet tall, said he had consumed three glasses of vodka and tonic at a bar between 10:30 p.m. and 1:15 a.m. after having chicken and potatoes for dinner. Driver's demeanor was calm and his speech was normal, but he smelled of alcohol and his eyes were glassy, though not bloodshot.

Driver agreed to perform field sobriety tests (field tests), but was unable to track the stimulus for the horizontal gaze nystagmus test. On the one leg stand tests, he put his foot down on the count of 1,014 on the first test and between 1,025 and 1,026 on the second test. He counted off 30 seconds when 60 had elapsed. During the Romberg time estimation test, it took driver 40 seconds to estimate that 30 seconds had passed, during which he had eyelid tremors and swayed about one inch from side to side.

Two screening tests indicated driver's blood alcohol was 0.087 percent at 2:33 a.m. and 0.088 two minutes later. The officer arrested driver and transported him. Breath tests at 3:28 and 3:30 a.m. recorded driver's blood alcohol as 0.08 percent.

The administrative hearing officer accepted Kenneth Mark and Alice King as experts on the metabolism of blood alcohol and the mechanics of blood testing. On behalf of driver, Mark testified that based on the instrument measurements, "it is quite likely that [driver's blood alcohol] was less than a .08 percent" when he was stopped at 2:17 a.m. "[R]easonably, the actual alcohol content at the time of driving was a .07." He explained:

"Since the blood alcohol level will decline over time at a rate of roughly a .016 percent per hour, if there were no alcohol being absorbed between the time of the [screening] test and the time of the evidential test, the blood alcohol level would have declined to a .07 percent, but it did not. It remained the same between the time of the two tests, which indicates that there was alcohol being absorbed into the bloodstream during that timeframe."

"If there were alcohol in the stomach at the time of the [screening] test, that necessarily would have meant that there had been—been more alcohol in the stomach at the time of the traffic stop, which meant that the blood alcohol level would have increased from the time of the traffic stop to the time of the [screening] test and would have continued to increase after the time of the [screening] test and then that alcohol would have been burned off and the blood alcohol level would have declined to the time of the evidential test."

"[A] way of visualizing this is there is a curve (inaudible) increases from the time of driving at 2:17 through the time of the [screening] test at 2:33 and 2:35, peaking thereafter and then declining to the time of the evidential test at 3:28 and 3:30, so what we have is a curve."

If the initial measurements after the stop reflected a steadily decreasing blood alcohol, then his blood alcohol would have been lower an hour later, unless he kept drinking after he was arrested.

King testified that the blood alcohol measurements were too high to corroborate driver's account of having three drinks of vodka between 10:30 p.m. and 1:15 a.m. Based on driver's account, his blood alcohol should have been 0.02 to 0.03 percent by

3

3:20 a.m.[1] The breath test they employed was accurate within 0.01 percent, so the 0.08 test result meant that driver's blood alcohol at 3:20 a.m. was between 0.07 and 0.09 percent.[2] Based on that measurement, assuming that driver had fully absorbed all of the alcohol and had eliminated it at a normal rate between 0.015 and 0.018 percent per hour, his blood alcohol would have been about 0.08 to 0.09 percent at the time of driving.

King was unable to account for the screening test results. She questioned their accuracy.[3] On cross-examination, King stated that the blood alcohol results of breath tests cannot be compared with screening tests because they use different technologies. She was unable to extrapolate the blood alcohol at the time of driving from the results of the screening and breath tests without also knowing driver's drinking pattern and what food was in his stomach, as food affects the rate of absorption. She was unable to say whether driver's blood alcohol was rising or falling during either test. She did acknowledge that blood alcohol has been known to rise. As the trial court noted, King eventually agreed that, "if there is the absence of that constant rate of elimination over the course of an hour, that is an indication that the blood alcohol level was rising and plateaued over that hour."

---

[1] Although the administrative hearing officer posited that the breath tests occurred at 3:28 and 3:30 a.m., King repeatedly referred to the breath test as occurring at 3:20 a.m.

[2] Part of King's testimony was: "if you really want to—get technical about it, you don't have a (inaudible) on the breath result. So I don't know (inaudible) of .081 or .089 (inaudible) for an example (inaudible) blood alcohol is eliminating at .01 something, that's very close." The parties understand her to have said that because the third digit of the breath tests was not recorded, a 0.08 result meant anything from 0.080 to 0.089.

[3] When asked by the hearing officer about the screening test, King answered, "I can testify to—the results that we get (inaudible) using our instrumentation. I can—I don't know how accurate the [screening] device—I know—it's pretty accurate, but I couldn't tell you exactly how accurate it is."

4

## II. DISCUSSION

### A. *STANDARDS OF REVIEW*

Due to the importance of a driver's license, a trial court independently determines whether an administrative license revocation is supported by the weight of the evidence. (*Berlinghieri v. Department of Motor Vehicles* (1983) 33 Cal.3d 392, 398; *Lake v. Reed* (1997) 16 Cal.4th 448, 456-457 (*Lake*); *Coffey v. Shiomoto* (2015) 60 Cal.4th 1198, 1217 (*Coffey*); Code Civ. Proc, § 1094.5, subd. (c).) The trial court ordinarily determines the credibility of any expert witness. (*Coffey, supra*, at p. 1218; contra, *Borger v. Department of Motor Vehicles* (2011) 192 Cal.App.4th 1118, 1122 (*Borger*).)

"[T]he scope of our review on appeal is limited: '[W]e "need only review the record to determine whether the trial court's findings are supported by substantial evidence." [Citation.] " 'We must resolve all evidentiary conflicts and draw all legitimate and reasonable inferences in favor of the trial court's decision. [Citations.] Where the evidence supports more than one inference, we may not substitute our deductions for the trial court's. [Citation.] We may overturn the trial court's factual findings only if the evidence before the trial court is insufficient as a matter of law to sustain those findings.' " ' " (*Coffey, supra,* 60 Cal.4th at p. 1217, quoting *Lake, supra*, 16 Cal.4th at p. 457.)

### B. *SUFFICIENCY OF EXPERT TESTIMONY*

By statute, there "is a rebuttable presumption that the person had 0.08 percent or more, by weight, of alcohol in his or her blood at the time of driving the vehicle if the person had 0.08 percent or more, by weight, of alcohol in his or her blood at the time of the performance of a chemical test within three hours after the driving." (Veh. Code, § 23152, subd. (b).) This presumption of blood alcohol remaining constant has been applied in administrative license suspension proceedings conducted by the DMV. (See *Coffey*, *supra*, 60 Cal.4th at p. 1208, and cases there cited.) This presumption shifts the burden of producing evidence of blood alcohol to the driver. (*Id.* at p. 1209.) If a driver

produces evidence supporting a finding that the driver's blood alcohol was under 0.08 percent, " 'the presumption disappears' [citation] and 'has no further effect.' " (*Id.* at p. 1210; cf. *People v. Beltran* (2007) 157 Cal.App.4th 235, 247 (*Beltran*) [prejudicial error to instruct jury about permissive inference when experts agreed blood alcohol was rising at time of first screening test].)

The trial court found driver's evidence sufficient to rebut the chemical test results. On appeal the DMV renews its contention that Mark's testimony was too speculative to rebut this statutory presumption and did not account for "a sudden spike in [driver's blood alcohol] . . . within minutes of the traffic stop." But it did not take an expert to establish that driver's blood alcohol first increased and then decreased after he drank alcoholic beverages. It is common knowledge that the intoxicating effect of an alcoholic beverage is not instantaneous, but increases after consumption and then diminishes over time after consumption ends. (Evid. Code, § 452, subd. (g); *People v. Mueller* (1914) 168 Cal. 526, 528 [court took judicial notice that wine contains alcohol and "is intoxicating when taken into the stomach"]; *In re Martin* (1962) 58 Cal.2d 509, 512 ["It is a matter of common knowledge that the intoxicating effect of alcohol diminishes with the passage of time . . ."].)[4] Driver's expert Mark testified consistently with common

---

[4] Indeed, the California Supreme Court appears willing to take judicial notice of the following as scientific principles. "After ingestion and absorption through the stomach walls and the intestines, ethyl alcohol enters the blood and eventually travels via the carotid arteries to the brain, where it causes intoxication and resulting mental and physical impairment. [Citations.] At the same time that absorption of alcohol occurs, elimination also commences through excretion and metabolization. 'When a person's body is absorbing alcohol faster than he or she is eliminating it, the concentration of alcohol in the blood will continue to rise. . . . The concentration will reach its peak, and it will achieve a plateau, at the time when elimination and absorption are occurring at about the same rate. [¶] [Thereafter,] [w]hen the person . . . slows down ingestion to the point where the body is eliminating alcohol more quickly than absorbing it, the body enters what has generally been referred to as the post-absorptive phase. During this period of

*(Continued)*

6

knowledge that when alcohol is consumed, blood alcohol levels will first rise and then fall. This scientific principle explained why driver's blood alcohol measured virtually the same in tests performed 55 minutes apart. Mark's testimony was substantial evidence rebutting the presumption in Vehicle Code section 23512, subdivision (b) that a tested blood alcohol has remained constant over time.

The Supreme Court reached the same conclusion in *Coffey*, which was decided after the close of briefing in this case. In *Coffey*, the breath tests showed a driver's blood alcohol to be 0.08 percent 56 minutes after she stopped driving and 0.09 percent three minutes later. 83 minutes after she stopped, a blood test established a blood alcohol of 0.095 percent. (*Coffey, supra*, 60 Cal.4th at p. 1205.) An expert named Williams testified that these ever-increasing test results were consistent with the driver's blood alcohol rising from a point below 0.08 percent when stopped. (*Ibid..*) The Supreme Court found at page 1211: "Williams's testimony was sufficient to rebut the presumption that plaintiff's [blood alcohol] was at least 0.08 percent at the time she was driving. Williams was qualified as an expert in the field and his testimony was clear and direct. If believed, his evidence would have justified a conclusion that plaintiff's [blood alcohol] was rising at the time of her chemical tests and was thus quite possibly below the 0.08 percent threshold at the time she had been driving."

In our case, the trial court accepted similar expert extrapolation as establishing that driver's blood alcohol was below 0.08 percent when he was stopped.[5] Applying

time, the concentration of alcohol in the blood decreases.'" (*People v. Vangelder* (2013) 58 Cal.4th 1, 14.) DMV relies on this passage.

[5] The DMV relies heavily on *Borger, supra*, 192 Cal.App.4th 1118. In that case the trial court accepted an expert's testimony "that all 'Intoxilyzer 5000' machines have an inherent margin-of-error of plus or minus .02 percent." (*Id.* at pp. 1120-1121.) The appellate court found this testimony too "speculative" to amount to substantial evidence. (*Id.* at p. 1122.) According to *Borger*, accepting this testimony "would, in essence,

*(Continued)*

deferential review to the trial court's evidentiary findings, we conclude that Mark's testimony amounted to substantial evidence in support of the trial court's ruling.

### 3. *CIRCUMSTANTIAL EVIDENCE OF BLOOD ALCOHOL CONCENTRATION*

The DMV also renews its contention that the totality of circumstantial evidence established that driver's blood alcohol was at least 0.08 percent while driving.

*Coffey*, *supra*, 60 Cal.4th 1198 has reaffirmed that circumstantial evidence is admissible in driver's license revocation proceedings "to help connect . . . test results to a driver's [blood alcohol] at the time she was driving" and also "to rebut [the driver's] proffered defense that her [blood alcohol] was low at the time she was driving and only later rose to exceed the legal limit." (*Id.* at p. 1216.) "Even assuming that non-chemical-test evidence cannot *by itself* prove a driver's exact [blood alcohol] at the moment the driver is stopped by a police officer, in this case plaintiff's erratic driving, outward appearance of substantial intoxication, implausible story of having just turned 21 years old, and was coming from a bar without having imbibed alcohol at all, and her failure on multiple field sobriety tests, together tend to rebut [expert] Williams's theory of a rising [blood alcohol] and corroborate the [blood alcohol] test results. (*Ibid.*) "Having concluded the DMV hearing officer properly admitted the circumstantial, nontest evidence of plaintiff's intoxication, we also conclude substantial evidence supported the trial court's decision to deny writ relief, thereby sustaining the DMV hearing officer's

---

rewrite [Vehicle Code] section 13353.2, subdivision (a)(1)" (*id.* at p. 1123), "change the California Code of Regulations, title 17, article 7, sections 1221 through 1221.5" (*id.* at p. 1122), " 'overrule' every 'Intoxilyzer 5000' reported result unless it is .10 or more" (*ibid.*), and "effectively remove this breath testing device from the Department of Motor Vehicle's 'approved instrument' list." (*Ibid.*)

We note that the DMV expert in our case attributed a .01 percent margin of error to breath test machines and could not vouch for the accuracy of screening tests. Unlike the DMV's expert, driver's expert was willing to accept the test results as accurate.

decision to suspend plaintiff's license to drive. (*Id.* at p. 1217.) "[The hearing officer and the trial court] [b]oth reasonably relied on circumstantial evidence of plaintiff's intoxication—her general appearance, the odor of alcohol about her person, her erratic driving, and her failed field sobriety tests—to support the accuracy of the chemical test results . . . ." (*Id.* at p. 1218.) The driver in *Coffey* was "swerving erratically from side to side" on the highway. (*Id.* at p. 1203.) When stopped, her eyes were red and she denied consuming any alcohol despite having come from a bar after just turning 21. (*Ibid.*)

Here the DMV renews its claim that driver "performed poorly" on the field tests. Driver points out that the arresting officer did not offer an opinion about the field test results. As in *Coffey*, the trial court could have relied on circumstantial evidence of driver's performance on the field tests to reach a different conclusion about his blood alcohol while driving. However, the trial court apparently did not attach the same significance to this evidence that the trial court did in *Coffey*. In that case there was more circumstantial evidence of intoxication.

In the words of *Yordamlis v. Zolin* (1992) 11 Cal.App.4th 655, "Having reviewed the record, we cannot say that the trial court erred as a matter of law in finding the DMV's evidence insufficient to establish that [driver's blood alcohol] at the time of driving was 0.08 percent or more." (*Id.* at p. 660.) In that case, "[t]he DMV submitted evidence that Yordamlis was driving erratically, smelled of alcohol, and had bloodshot/watery eyes, slurred speech, and an unsteady gait" and a blood sample taken at an unknown time recorded a blood alcohol of 0.17 percent. (*Ibid.*) A majority noted that "nothing in the record establishes that Yordlamis's conduct is necessarily inconsistent with a [blood alcohol] of less than 0.08 percent." (*Id.* at p. 662.)

In the absence of expert testimony correlating exact blood alcohol percentages with performance results on field tests (cf. *Beltran*, *supra*, 157 Cal.App.4th 235, 246, fn. 10), the trial court was entitled to discount those equivocal results and the equivocal testimony of the DMV's expert in favor of the testimony of driver's expert. Resolving

9

evidentiary conflicts in favor the trial court's decision, we conclude it was supported by substantial evidence.

## III. DISPOSITION

The order is affirmed.

_____
                               RUSHING, P.J.



WE CONCUR:




_____
         PREMO, J.




_____
         MÁRQUEZ, J.




*Bakir v. Shiomoto, as Chief Deputy Director, etc.*
**H040714**